SONORA PHONOGRAPH CO., INC., AND SONORA, INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7419.   Promulgated June 27, 1929.

*George E. Cleary, Esq.,* and *Arnold Markel, C. P. A.,* for the petitioners.

*Eugene Meacham, Esq.,* and *C. E. Lowery, Esq.,* for the respondent.

1178

## OPINION.

LITTLETON: The first error assigned is that the Commissioner refused to determine the profits tax of the petitioners under the provisions of sections 327 and 328 of the Revenue Act of 1918. As the basis of this assignment of error, the petitioners contend that three grounds exist which would bring them within the provisions of section 327 and, therefore, entitled them to have the tax computed as provided in section 328.

We will consider these contentions in the order in which the events occurred which gave rise to the facts on which they are based. First, it is urged that special assessment should be granted for the reason that in 1913, at the date of the organization of the Sonora Phonograph Corporation, this corporation issued stock, having a par value of $25,000, for a mixed aggregate of tangible and intangible assets whose separate value at that time could not be satisfactorily determined. What the total value of these assets was is not shown, though it does appear that they were acquired from a trustee in bankruptcy shortly prior to the time when they were paid in to the corporation for stock, and there is some evidence to the effect that the price paid to the trustee in bankruptcy was the same as the par value of the stock issued therefor. It further appears that a value for the mixed aggregate of tangible and intangible assets equal to the par value of the stock issued therefor was allowed in invested capital by the Commissioner, without any reduction on account of the intangibles so ac-

quired. Under such circumstances, we fail to see where a basis for the application of the special assessment provisions exists. As we understand the intendment of these sections, it is to grant taxpayers relief—not to increase the tax on account thereof. For example, in the case of an acquisition of a mixed aggregate of tangibles and intangibles for stock, and where the value as an aggregate was shown but it was not possible to make a segregation as between the two classes, an injustice might be done where all or any part of the value was ascribed to intangibles, for the reason that the limitations prescribed by section 326 with respect to the acquisition of intangibles with stock would apply and might thereby cause an excessive reduction in invested capital, but where the Commissioner has seen fit to allow the total mixed-aggregate-acquisition cost without any reduction on account of intangibles which were acquired, and it has not been shown that there was error in his action, we fail to see where there is occasion to invoke the special assessment provisions or that the taxpayers have cause for complaint. Cf. *Sumpter Valley Railway Co.*, 10 B. T. A. 1325.

The next ground urged is that special assessment should be granted, for the reason that a contract of substantial value was acquired in 1916, which was an important income-producing factor in 1918, but which was not reflected in invested capital for such year, thereby producing an abnormal condition. A brief recital of the pertinent facts will make the contention clear. Some three or four years prior to 1916 the Victor Talking Maching Co. brought certain suits against the Sonora Phonograph Corporation for alleged infringements of patents held by the former company. Finally, the litigation was compromised under an agreement in which the aforementioned suits were withdrawn and an agreement was entered into under which the Sonora Phonograph Corporation was permitted to operate, with specified restrictions, under certain patents owned by the Victor Talking Machine Co. This last-named agreement provided for the payment by the Sonora Phonograph Corporation of a royalty of $2\frac{1}{2}$ per cent of its gross receipts from the sale of talking machines. The contract proved profitable to the Sonora Phonograph Corporation. What the petitioners contend is that because this contract was an important income-producing factor in their business and was not recognized among its assets at any cost or value, an abnormal situation existed, which requires the application of the special assessment provisions. With this we can not agree. In the first place, we fail to see where this contract occupied any different status from the usual contracts which are commonly entered into by business concerns and which prove advantageous. It seems to have been entered into under arms' length conditions; at least, the evidence would indicate

that the Sonora Phonograph Corporation was not so situated that it could require more than it gave under the contract. It was the Victor Talking Machine Co., the dominant and strongest concern in the talking machine field, which brought the suits which were compromised at the instigation of the Sonora Phonograph Corporation. At first the Victor Company refused to consider the withdrawal of the suits and the execution of this license agreement. The apparent reason for this attitude was that the Victor Company was not unaware of the strength of its position. A witness testified that " the Victor Talking Machine Company was very strong about their position, and maintained at all times most strenuously the validity of their patents." The president of the Sonora Phonograph Corporation testified that he was anxious to have the suits discontinued and that he knew it was impossible to show that the Victor Company did not have rights under their patents. Under such circumstances, it seems hardly reasonable to say that the contract represented a large bonus value to the Sonora Phonograph Corporation in excess of the annual royalties which it was required to pay; that is, that the royalties required to be paid were less than should have been paid and therefore an excess or bonus value existed in the contract. This is further emphasized by the fact that after the Sonora Phonograph Corporation had operated successfully for a time under the contract, and prior to its expiration, the Victor Company consented to a change and reduction in the amount of royalty payments. The logical deduction to be drawn from petitioners' position, should it be sustained, is that the party who had brought the suits and apparently was in the stronger position with respect thereto, was willing to give the other party a $1,000,000 advantage in order that it might accede to the request of the latter party to withdraw the suit. We do not think the evidence establishes such a fact. Certainly, in view of the conditions under which it was negotiated and the relative position of the parties, it would require more proof than we have to show that any capital value is being excluded on account thereof, much less the $1,000,000 value which was referred to in testimony. A contract may be advantageous in the sense that the person holding the same is able to realize good profits therefrom, but when this contract cost nothing other than the covenants entered into, which were mutual, the consideration on one side being the payment of certain stipulated royalties and on the other side the permission to operate under certain patents, we fail to see the existence of abnormal conditions which the special assessment provisions were intended to remedy. In no sense does statutory invested capital recognize a value attaching to such a contract, even when paid in to a corporation after negotiation, unless it is shown that a bonus value attaches thereto, and we do not

think that an opposite result may be reached by recourse to the relief provisions.

The third contention is that the ownership by the Sonora Phonograph Sales Co. in 1918 of the Schechter contract which was paid in for stock at the time of its organization in June, 1917, but whose value may not be included in invested capital because of the provisions of section 331 of the Revenue Act of 1918, gave rise to an abnormal condition which justifies the application of the special assessment provisions. The contract in question was entered into on May 10, 1917, between Jacob Schechter, acting in a fiduciary capacity in large part for stockholders of the Sonora Phonograph Corporation, and the Sonora Phonograph Corporation. Under the terms of the agreement, which contemplated the formation of a corporation to do the things which Schechter nominally obligated himself to do, Schechter was given the exclusive right to distribute the products of the Sonora Phonograph Corporation. There were also to be transferred to him certain rights in patents, trade-marks, agreements with suppliers of merchandise, agreements with jobbers, etc., but the general essence of the contract seems to have been the separation of the manufacturing and sales functions heretofore carried on by the Phonograph Corporation, so that the manufacturing end of the business would continue to be carried on by the said Phonograph Corporation and the sales and distribution features would be taken care of by the Sales Company. Shortly after the acquisition of the agreement, the Sales Company was formed with a capital stock of a par value of $6,000,000, and in the acceptance of the offer from Schechter to the Sales Company for the assignment of the contract it was specified that the entire capital stock should be issued for the contract, but that stock of a par value of $1,200,000 would be transferred back to the treasury to be sold for the purpose of supplying additional working capital. Of the remaining $4,800,000 par value of stock, $3,840,000 was issued to the president of the Phonograph Corporation, and at least the greater part of the balance of the stock was issued to other stockholders of the Phonograph Corporation. What connection, if any, there was between the one stockholder in the Sales Company, who was not shown to have been likewise a stockholder in the Phonograph Corporation, and the other stockholders of the Phonograph Corporation, or the Phonograph Corporation itself, we are not advised. There was. however, no money or property consideration, other than a nominal consideration of one dollar, paid by Schechter or the Sales Company to the Phonograph Corporation for whatever passed under the contract in question, and when we consider the further facts as to the relationship of the parties and the affiliated status of the two cor-

porations, we think it fair to say that there was little, if anything, added to the business unit as a result of the execution of the contract and the formation of the Sales Company other than would have occurred had a sales or distribution agency been formed without the formation of the second corporation. Certainly, there is nothing in the comparative net earnings of the Phonograph Corporation for the year preceding the transaction in question and the combined net earnings of the two corporations for the succeeding year which would reflect any appreciable increase in value on account of the paying in of the contract. Under such circumstances, does the exclusion of whatever value attached to this contract which was paid in for stock of the Sales Company give rise to an abnormal condition which would bring the petitioners within the provisions of section 327? We think not. Had the contract not been executed and had the Sales Company not been formed, the Phonograph Corporation could not have had the benefit, for invested capital purposes, of the values here contended for on a statutory basis and, in so far as statutory invested capital is concerned, the situation is no different because of what transpired. While this is not a case where one affiliated corporation transferred assets to another member of the same group, and thus resulted in there being nothing added to the group, it is a case closely analogous where assets which were owned by one corporation passed to and became the assets of an affiliated corporation which was formed with the same officers and apparently substantially the same stockholders, thus bringing about a situation where the assets of the group are essentially the same as the assets of the first corporation prior to the formation of the second corporation. To recognize an abnormality of this nature would be tantamount to saying that in a case where a corporation has built up good will or become possessed of intangibles without a statutory investment therein which could not be recognized under section 326, it is permissible to invoke section 327 in order to give effect to what section 326 specifically denies. We do not think this was ever intended; certainly not unless an exceptional and abnormal situation exists where some very great values are being excluded, and we are not satisfied that this is true in the case before us. Whatever intangibles are being excluded here do not represent any substantial statutory investment—at least we have not been shown facts which would warrant such a conclusion—other than the payment in to the Sales Company, where whatever values existed are being excluded by section 331, and as we said in *Morris & Co.*, 1 B. T. A. 704:

 \* \* \* It can not be consistently said that the statute excludes the item from invested capital and at the same time treats such exclusion as so abnormal as to be the ground for relief by special assessment.

An exception to the foregoing rule may be said to have been made in *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192, and *Detroit Opera House, Inc.*, 13 B. T. A. 587, but those situations were clearly distinguishable from the one at bar, since there the assets excluded were of such a large percentage that the very assets on which the life of the business depended were being excluded, which is not shown to be the case here. In the situation before us, we have an affiliated group where no exclusion is being made on account of the principal corporation, which apparently parted with nothing in the formation of the Sales Company which was recognizable for invested capital purposes, and while all assets are being excluded as to the Sales Company, the exclusion is from one member of an affiliated group with the recognizable values on account of these assets shown in the other member of the group. That some value of intangibles is not being recognized is no more ground for special assessment than unrecognized appreciation on account of tangibles. What the value of the unrecognized intangibles here was, we do not consider it necessary to determine, since we are not convinced that an abnormal situation exists on account thereof. Certainly, the evidence we have as to a few sales of a small number of shares of the Sales Company's stock in 1917 does not establish this fact, nor the sale of a substantial number of shares in 1918 to the president and principal stockholder of the Sales Company, payment being made in small part in cash, but largely in notes. It is true that by allowing a fair return on tangibles there is an excess value shown which might be attributable to a value attaching to intangibles or which might reflect merely a high return on the normal invested capital, in which latter case no ground for special assessment exists. Suffice it to say that we are not satisfied that an abnormality exists, on account of this exclusion, for which relief may be obtained under the special assessment provisions.

The remaining question is whether the Sonora Phonograph Corporation is subject to the delinquency penalty determined by the respondent. The petitioners contend that the tentative return on Form 1031 T filed on March 15, 1919, was sufficient to secure an extension of time for filing the returns of both corporations and not for only one of them, the Sonora Phonograph Sales Co., as determined by the respondent.

Printed in the body of the tentative return in question is the statement " Note—A parent company may make a tentative return and pay the first installment of tax on behalf of all its subsidiaries without apportioning the tax among them until the completed return is filed." Following this are the printed words " Estimated amount of tax," after which was typed " Consolidated with Sonora Phonograph Corp., $40,000." Following this is a notation indicating that a re-

mittance for $10,000 by check or draft was made therewith. On June 16, 1919, instead of submitting a consolidated return for themselves, the petitioners each filed separate returns in which they set out in detail their income and invested capital. The respondent determined that the petitioners were affiliated during 1918, and there is here no question as to the correctness of such determination.

The procedure outlined in article 651 of the preliminary edition of Regulations 45, released on March 5, 1919, which provided that a corporation desiring an extension of time for filing its return should submit to the collector before the time for filing the return a tentative return and estimate on Form 1031 T, accompanied by a remittance of not less than one-fourth of the estimated amount of income, war-profits and excess-profits taxes for the taxable year, was in effect when this tentative return was filed. That Form 1031 T provided that a parent company might make a tentative return on behalf of its subsidiaries and pay the first installment of their taxes without apportioning the tax among them. We think, under the facts and circumstances, that the tentative return here involved was a tentative return for the two corporations and the extension granted applied equally to both.

While the respondent in his determination of the deficiencies here involved determined that the Sonora Phonograph Corporation was subject to a delinquency penalty, the evidence shows that in January, 1927, and more than a year after the determination and the filing of the petition in this proceding, he abated the delinquency penalty of $6,249.23 formerly assessed against the corporation and taken into consideration in determining the deficiency against it. In a stamp on the return relating to the abatement of the penalty appears the statement "Penalty assessed in error. Extension granted, affidavit attached to claim." Apparently the amount of $6,249.23 was abated for the reason that it had been assessed in error because of an extension having been granted. While no admission or concession was made by the respondent either at the hearing or in his brief as to the correctness of his action in abating the amount of $6,249.23, it is in conformity with our opinion that the tentative return was for both corporations and that the extension of time granted applied to both of them.

Since an extension of time was granted for the filing of the Sonora Phonograph Corporation's completed return, we do not think the corporation is subject to the delinquency penalty determined by the respondent.

Reviewed by the Board.

*Judgment will be entered under Rule 62 (c).*

TRAMMELL, dissenting: The petitioners contend that the contract including the assets which Schechter acquired from the Sonora Phonograph Corporation and transferred to the Sonora Phonograph Sales Co. for $4,800,000 par value of its capital stock had a value of more than $1,000,000 at the time paid in, which, but for the provisions of section 331 of the Revenue Act of 1918, would be included in invested capital to the extent of their actual value, but not exceeding the amount of $1,310,625, or 25 per cent of the par value of the combined outstanding capital stock of the petitioners at the beginning of the year. They also contend that, since the contract and the assets acquired thereunder were not reflected in invested capital, there resulted an abnormal condition which brings them within the purview of section 327.

The contract in question gave the Sonora Phonograph Sales Co. exclusive right to distribute the products of the Sonora Phonograph Corporation throughout the life of that corporation. Among other things, it gave to the Sonora Phonograph Sales Co. patents, trademarks, trade names, the entire selling end of the business, and provided it with an established sales organization and outlet for the products and furnished it with an established source of supply for merchandise. Unquestionably, these were valuable assets so far as the Sonora Phonograph Sales Co. was concerned.

This contract and the assets were transferred to Schechter for and in behalf of himself and others, some of whom were the stockholders of the Sonora Phonograph Corporation who acquired them with the view of forming another corporation to carry on the sales end of the business. It is not shown that all of the stockholders of the Sonora Phonograph Corporation partook in this transaction and there is nothing to show that it amounted to a distribution of dividends, either liquidating or otherwise. If the stockholders of the Sonora Phonograph Corporation had received the assets transferred in accordance with the stockholdings, it would have amounted to a distribution and a closed transaction which would have fixed a basis for valuation and inclusion in invested capital, subject to the effect of section 331. Such assets could have been included in invested capital at the value as of the time received in distribution by the stockholders. If this had been the case, doubtless this controversy would not have arisen. The corporations then would have been affiliated by virtue of the stock ownership by the same individuals in the same proportion. But this fact is not shown by the record. All the record discloses is that some of the stockholders acquired the assets and transferred them to the sales corporation. They acquired them without cost, and consequently there is under section 331 no basis for the inclusion thereof in invested capital. The fact that the cor-

porations were affiliated in 1918 is not material. Conditions as to stock ownership might have been materially different in 1917, when the assets were transferred. The record before us presents simply a question, as both parties to this controversy concede, of the exclusion of the value of assets from invested capital by the operation of section 331. This is not a case where one affiliated corporation transferred assets to another corporation in the group, leaving the group in the same situation as it was before.

The consolidated invested capital of the affiliated group is made up of the invested capital of the corporations separately determined, with eliminations for duplication. *American Bond & Mortgage Co.*, 15 B. T. A. 264; *Grand Rapids Dry Goods Co.*, 12 B. T. A. 696. Here there would be no duplication in so far as this transaction is concerned. It was not an intercompany transaction, but one between individuals and the sales company. Since we can not find that the transfer of the contract and assets by the Sonora Phonograph Corporation to the individuals constituted a distribution, that transaction does not establish a cost basis of the assets to the individuals. They were acquired by the individuals without monetary consideration, and for this reason, only, can not under section 331 be included in invested capital of the company.

Does the exclusion of the value of the contract and assets result in an abnormality within the meaning of the statute? The question to be determined in order to answer the question is, Were the assets excluded by this means of substantial value over and above the amount at which they were included in invested capital and were they a material income-producing factor?

During 1917 cash sales of Sonora Phonograph Sales Co. stock were made at $75 per share and in 1918 George E. Brightson, who was president of both companies, purchased 5,000 shares at $75 per share, making payment partly in cash and partly in notes. If these stock sales be taken as indicative of the value of the rights and assets acquired under the contract, the value thereof would be $3,600,000, which was substantially more than $1,310,625, the maximum amount that could have been included in invested capital but for the provisions of section 331.

The earnings in comparison with the tangible assets would indicate a value of the intangibles of approximately $900,000. It is not necessary here, however, to determine the exact value of the intangibles further than that they were substantial in amount as compared with the allowed invested capital.

The very purpose for which the Sonora Phonograph Sales Co. was organized was to take over the contract and assets. It had no other assets. The sales contract and the other intangible assets in-

cluded thereunder were the source of its income and as these assets clearly had a substantial value, which could not be included in invested capital, it is my opinion that there was such an abnormality in the capital as to entitle the petitioners to have their profits-tax liability determined under the provisions of section 328. See *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Detroit Opera House, Inc.*, 13 B. T. A. 587.

On the other hand, if the transfer of the assets and contract to the sales corporation be entirely ignored, and it be treated as if they had not been transferred, on the theory that it was a transfer within an affiliated group of corporations, it is my opinion that the fact that patents, trade-marks and trade brands and other assets of an intangible nature, of such substantial value as the evidence discloses, built up or acquired by the phonograph corporation, were excluded entirely from invested capital, brings the case within section 327 (d).